```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
              CIVIL NO. 20-2432(DSD/DTS)
```

Commercial Bag Company,

       Plaintiff,

v.                                     ORDER

Land O'Lakes,

       Defendant.

      Stephen R. Brown, Esq. and Esbrook P.C., 321 North Clark Street, Suite 1930, Chicago, IL 60654, counsel for plaintiff.

      Jonathan C. Miesen, Esq. and Land O'Lakes, Inc., 4001 Lexington Avenue North, Arden Hills, MN 55126, counsel for defendant.

This matter is before the court upon defendant Land O'Lakes, Inc.'s motion for summary judgment and plaintiff Commercial Bag Company's motion for partial summary judgment. Based on a review of the file, record, and proceedings herein, and for the following reasons, defendant's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

## BACKGROUND

Since 2015, Commercial Bag Company has supplied woven polypropylene bags to Land O'Lakes, which uses the bags to hold products such as animal feed. Compl. ¶¶ 1, 11. Although the parties' amended supply agreement provided that either party could terminate the relationship without cause, see Compl. Exs. 1, 2,

Commercial contends that when the parties extended their agreement in 2018, Land O'Lakes committed to purchasing all of its bag requirements from Commercial through March 2024. After Land O'Lakes purported to terminate this arrangement in August 2020, Commercial brought this lawsuit alleging breach of contract, breach of the covenant of good faith and fair dealing, mutual and unilateral mistake, and promissory estoppel.

The parties' relationship is governed by a "Packaging Materials Supply Agreement," id. Ex. 1 (Agreement), and several amendments to that Agreement. The application and interpretation of these amendments forms the basis of the parties' current dispute.

As initially conceived in the Agreement, Land O'Lakes agreed to buy, and Commercial agreed to provide, a portion of polypropylene bags Land O'Lakes required. Specifically, the Agreement required Land O'Lakes to make its "best reasonable efforts to purchase approximately 15-20% of its annual [bag] volume from" Commercial. Id. § 4.3. The Agreement did not require Land O'Lakes to exclusively purchase bags from Commercial, however. Id.

The Agreement's initial term was two years, from January 2015 until December 2016, with a one-year renewal option. Id. § 2. The Agreement could only be terminated by either party "for cause in the event of any default by the other [party] if such default

2

is not cured within ninety (90) days . . . ." Id.  In late 2016, the parties orally agreed to renew the Agreement for another year. Thompson Aff. ¶ 10; Danner Dep. at 31:16-32:10.

In August 2017, Land O'Lakes and Commercial entered into another extension of the original Agreement, but this extension was accomplished with an amendment to that Agreement. Compl. Ex. 2. Titled, "Amendment #1 to Packaging Materials Supply Agreement," this amendment extended the term of the parties' relationship for an additional year, until August 2018 "unless otherwise terminated in accordance with the Agreement." Id. § 2.  The amendment also explicitly changed the termination provisions in the Agreement, providing that "Section 2, Term and Termination, is amended to add the following at the end of the Section:  [Land O'Lakes] may terminate this Agreement without cause upon 90 calendar days' prior written notice to [Commercial]." Id. § 3.

Commercial contends that Amendment 1 was only intended to be a stop-gap between the original Agreement and a potential new relationship between the parties. And indeed, several months after signing Amendment 1, Land O'Lakes issued a request for proposal (RFP) from more than 20 bag manufacturers, seeking a longer-term relationship with one or more manufacturers.  ECF No. 52-16. Commercial was aware of the RFP and made a bid for Land O'Lakes' business through the RFP.  ECF No. 53-8.

3

As part of the RFP, Land O'Lakes supplied the bidding manufacturers with a sample contract setting forth the terms and conditions that Land O'Lakes anticipated would be included in any future agreement. ECF No. 52-16 at CP00004750-4759. This sample agreement's termination provision was a for-cause termination provision akin to the provision originally included in the Agreement. Id. at CP00004750.

Land O'Lakes ultimately decided to accept Commercial's bid. But rather than negotiating a new agreement, Land O'Lakes and Commercial merely amended the Agreement. Compl. Ex. 3. This "Amendment #2" noted that the parties had previously entered into the Agreement and "wish[ed] to amend the Agreement" in certain ways. Id. at 1. Amendment 2 provided that the Agreement's term would be extended for five years and three months, expiring March 31st, 2024,[1] "unless otherwise terminated in accordance with the Agreement." Id. § 2. Amendment 2 also replaced the Agreement's exhibits with new Exhibits A through G that updated the pricing in the Agreement, but Amendment 2 specified that "[e]xcept as otherwise modified herein, all remaining terms and conditions set forth in the Agreement remain in full force and effect." Id. § 5.

New Exhibit A to Amendment 2 listed pricing for the bags Commercial was to supply. In the heading above the "Woven Poly

---

[1] Five years and three months from the date of Amendment 2 was in fact March 31, 2023. The incorrect date appears to be a scrivener's error.

4

Bags Price List" the parties included a parenthetical: "(as of January 1st, 2018, Estimated Annual Volume of 85M)." Id. Ex. A p. 2. According to Commercial, the inclusion of this language obligated Land O'Lakes to buy 85 million bags per year from Commercial. Exhibit A also provided that Commercial would credit Land O'Lakes with $375,000 in "plating costs." Id. at p. 1. There is no dispute that "plating costs" are the cost of developing plates for printing information on the bags.

Throughout the term of the Agreement, Commercial sourced most of the bags it provided to Land O'Lakes from factories in Vietnam. Danner Dep. at 32:11-33:15. Shortly after the parties executed Amendment 2, however, the United States International Trade Commission (USITC) began to investigate complaints that Vietnamese polypropylene bag factories were engaging in illegal "dumping" of their products in the US market. Thompson Aff. ¶ 29. Aware that a finding of illegal dumping would cause the United States to impose duties or tariffs on bags from Vietnam, the parties signed another amendment to the Agreement in July 2018. Compl. Ex. 4. This "Amendment #3" provided for Land O'Lakes to pay any new tariffs on Vietnamese bags.[2] Id. § 2.a. Commercial agreed to find a new manufacturing location, subject to Land O'Lakes' approval,

---

[2] Amendment 3 also provided that an employee of Commercial would work at the Land O'Lakes facility in Minnesota, and the majority of the Amendment relates to that employee-sharing agreement.

5

if necessary "to provide a cost competitive bag." Id. § 2.e. Unlike Amendment 2, which referenced only the Agreement itself in its initial recitations, Amendment 3 "further amend[ed]" the Agreement and both the first and second amendments thereto. See id. at p. 1.

The USITC ultimately imposed significant tariffs on polypropylene bags from Vietnam. Thompson Aff. ¶ 33. Commercial thereafter secured the services of a factory in Thailand, but Land O'Lakes made the decision to procure a portion of its bags from domestic manufacturers going forward. Id. ¶¶ 34, 37. In March 2020, Land O'Lakes informed Commercial of this decision, stating that this "repositioning" "will result in a discontinuation of the business relationship between Land O'Lakes and Commercial" with respect to polypropylene bags. Compl. Ex. 5. In August 2020, Land O'Lakes gave Commercial 90 days' notice that it was terminating the Agreement, effective November 2020. Compl. Ex. 8. Commercial filed this lawsuit shortly thereafter.

Commercial alleges that Amendment 2 eliminated the termination provision from Amendment 1, and that Land O'Lakes was obligated to continue to buy bags from Commercial until March 31, 2024. Commercial also asserts that Land O'Lakes was required to buy at least 85 million bags per year from Commercial pursuant to Amendment 2. And to the extent that the terms of the various Amendments allowed Land O'Lakes to terminate the parties'

6

relationship without cause, Commercial argues that those contracts must be reformed under the equitable doctrines of mutual or unilateral mistake.

Land O'Lakes moves for summary judgment on all of Commercial's claims, contending that the terms of the parties' written agreements unambiguously allowed Land O'Lakes to terminate the Agreement with 90 days' notice. For its part, Commercial asks for a judgment that Land O'Lakes could only terminate the Agreement for cause and was therefore obligated to purchase 85 million bags per year until March 2024. Commercial also seeks a judgment that there is no basis for Land O'Lakes' unclean hands defense to Commercial's reformation claims. Commercial does not specify on which of its claims it seeks these judgments, although Commercial's arguments seem to be that it is entitled to judgment on its claims for breach of contract and breach of the implied covenant. Its contention regarding the unclean hands defense does not otherwise ask the court to determine that reformation is appropriate.

## DISCUSSION

### I. Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only when its resolution affects the

outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

The court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party must set forth specific facts sufficient to raise a genuine issue for trial; that is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 249B50; Celotex v. Catrett, 477 U.S. 317, 324 (1986). Moreover, if a plaintiff cannot support each essential element of his claim, the court must grant summary judgment, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

## II.  Contract Claims

The parties agree that Minnesota law and the Uniform Commercial Code apply to the agreements at issue. When interpreting contracts, courts seek "to ascertain and enforce the intent of the parties." Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 364 (Minn. 2009). "[L]anguage is to be given its plain and ordinary meaning." Brookfield Trade Ctr. v. Cty. of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). Construction of an

unambiguous contract is a legal question for the court, while construction of an ambiguous contract is a factual question for the jury. Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn. 2003).

A contract is ambiguous only when its terms are "susceptible to more than one reasonable interpretation." Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc., 913 N.W.2d 687, 692 (Minn. 2018). A court determines whether a contract is ambiguous "based solely on the language of the contract." Maurice Sunderland Architecture, Inc. v. Simon, 5 F.3d 334, 337 (8th Cir. 1993). "Minnesota courts assign unambiguous contract language its plain meaning and refrain from rewriting, modifying, or limiting its effect by a strained construction." Feed Mgmt. Sys., Inc. v. Comco Sys., Inc., 823 F.3d 488, 493 (8th Cir. 2016). Further, the court reads contract terms within "the context of the entire contract" and interprets the contract "to give meaning to all of its provisions." Brookfield Trade Ctr., 584 N.W.2d at 394. Under the UCC, "a clause stating that the written agreement is a complete and exclusive statement of the terms of the agreement will likely be sufficient to exclude" consideration of extrinsic evidence. St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp., 428 N.W.2d 877, 880 (Minn. Ct. App. 1988) (quotation omitted).

Commercial relies almost solely on extrinsic evidence, such as emails and both its and Land O'Lakes' internal discussions, for

its argument that Amendment 1 did not survive the 2018 extension of the parties' partnership. But "[o]nly if the contract is ambiguous will the court go beyond the four corners of the document and examine extrinsic evidence of the parties' intent." BP Prod. N. Am., Inc. v. Twin Cities Stores, Inc., 534 F. Supp. 2d 959, 962 (D. Minn. 2007) (citing Hous. & Redev. Auth. of Chisholm v. Norman, 696 N.W.2d 329, 337 (Minn. 2005)). Commercial does not seriously assert that the Agreement or the Amendments are in any way ambiguous. Rather, the essence of Commercial's argument is that the various writings do not mean what they say. Because the parties' written agreements are unambiguous, however, consideration of extrinsic evidence "to vary, contradict, or alter the meaning" of them is inappropriate. Alpha Real Estate Co. v. Delta Dental Plan, 664 N.W.2d 303, 312 (Minn. 2003).

Amendment 1 unambiguously changes the termination provision in the Agreement so that, after Amendment 1's effective date, Land O'Lakes is allowed to terminate the Agreement "without cause upon 90 calendar days' prior written notice to [Commercial]." Compl. Ex. 2 § 3. Amendment 2 does not address termination, providing that "all remaining terms and conditions set forth in the Agreement remain in full force and effect." Id. Ex. 3 § 5. As of the date of Amendment 2, the Agreement's termination provision included the language from Amendment 1. Amendment 3's reference to Amendment 1 further enforces the conclusion that the termination provision

10

in Amendment 1 remained in effect after Amendment 2. Id. Ex. 4, at 1. Finally, the Agreement itself provides that it is the "complete agreement" between the parties and that any "modification, alteration, or change in the terms" of the Agreement is not "effective unless made in writing and signed by both parties." Id. Ex. 1 § 28. There is no written alteration of the termination provision other than Amendment 1.

Commercial also contends that Land O'Lakes violated the Agreement as amended because it did not buy 85 million bags from Commercial and because it did not pay the plate and printing costs Commercial demanded it pay. To the extent that the failure to purchase 85 million bags did not explicitly violate the contract, Commercial asserts that it violated the implied covenant of good faith and fair dealing.

The plain and unambiguous language of the parties' written agreements belies these aspects of Commercial's breach claims. None of the written agreements required Land O'Lakes to buy any specific quantity of bags; as Amendment 2 stated, the parties "estimated" that the annual volume would be 85 million bags, Compl. Ex. 3, at 2, but the Agreement also provided that Land O'Lakes had the right to terminate at any time. Id. Ex. 2 § 2. And the requirement that Land O'Lakes pay for plating costs was unambiguously a reimbursement provision. Although Commercial scrupulously avoids explicitly conceding this point, the

11

undisputed evidence shows that Commercial did not pay any costs for plating or printing. See Suphantarida Decl. ¶ 7; Nguyen Decl. ¶ 6. Commercial therefore has no claim that Land O'Lakes breached the Agreement and Amendment 2 by failing to reimburse Commercial for these costs.

Commercial's good-faith-and-fair-dealing claim based on Land O'Lakes' conduct fares no better. Commercial concedes that the UCC governs the parties' relationship; the UCC bars independent claims for an alleged violation of the duty of good faith and fair dealing. See Minn. Stat. § 336.1-304, cmt. 1 (Stating that the UCC's "obligation of good faith" section "does not support an independent cause of action for failure to perform or enforce in good faith. Rather, this section means that a failure to perform or enforce, in good faith, a specific duty or obligation under the contract, constitutes a breach of that contract . . . ."). And even if there was an independent cause of action for breach of the implied covenant of good faith, the evidence Commercial puts forward does not establish such a breach. The Agreement allowed Land O'Lakes to terminate at any time, for any reason, or no reason. Land O'Lakes' proffered reasons for terminating — to bring production of bags back to the United States in order to lessen supply disruptions and avoid tariffs, or even to forestall any future USITC action — are not bad-faith reasons under any interpretation of that term. Land O'Lakes is entitled to summary

judgment on Commercial's claim for breach of the implied covenant of good faith and fair dealing.

**III. Equitable Claims**

Commercial's promissory estoppel claim requires little discussion. Minnesota does not allow a claim for promissory estoppel when there is written contract that governs the parties' relationship. See HomeStar Prop. Sols., LLC v. Safeguard Properties, LLC, 370 F. Supp. 3d 1020, 1028 (D. Minn. 2019) (Nelson, J.) ("Minnesota courts routinely bar promissory estoppel claims as a matter of law when there is no dispute that a written contract governs the at-issue conduct."). Having determined that the Agreement and the various Amendments are enforceable and set forth the parties' duties toward each other, Commercial cannot establish a claim for promissory estoppel.

Neither has Commercial raised any genuine issue of material fact on its remaining equitable claims, which seek reformation of the parties' contract under the doctrine of either mutual mistake or unilateral mistake. Reformation of a written agreement is a rarely used remedy on which Commercial bears a heavy burden of proof: "a preponderance of the evidence is insufficient, and nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement." Bailey v. Lisle Mfg. Co., 238 F. 257, 266 (8th Cir. 1916); see also

Leamington Co. v. Nonprofits' Ins. Ass'n, 615 N.W.2d 349, 354 (Minn. 2000) (Reformation "must be established by evidence that is clear and consistent, unequivocal and convincing.") (quotation omitted).

To prevail on its reformation claims, Commercial must demonstrate:

> (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party.

Nichols v. Shelard Nat. Bank, 294 N.W.2d 730, 734 (Minn. 1980). Commercial contends that Amendment 2 set forth the parties' real intentions, because it did not mention Amendment 1 nor did it have a without-cause termination provision. But Amendment 2 referenced the Agreement, which had been amended by Amendment 1 to include without-cause termination. And even if Commercial did not intend this result, the evidence is clear that Land O'Lakes did. There was no mutual mistake.

Nor can Commercial successfully claim unilateral mistake. "Absent ambiguity, fraud or misrepresentation, a mistake of one of the parties alone as to the subject matter of the contract is not a ground for reformation." Nichols v. Shelard Nat. Bank, 294 N.W.2d 730, 734 (Minn. 1980). The evidence is far from that necessary to establish fraud or misrepresentation here, and the parties' written contracts are not ambiguous. Commercial is a

--

sophisticated business entity. Even a cursory reading of the Agreement and its Amendments would have disabused Commercial of any notion that Amendment 2 superseded the without-cause termination provision in Amendment 1. Reformation on the basis of unilateral mistake is not warranted.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERERD** that:

1. The motion for summary judgment [ECF No. 40] is granted;

2. The motion for partial summary judgment [ECF No. 50] is denied; and

3. The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 31, 2022

s/David S. Doty
David S. Doty, Judge
United States District Court